ELIAS S. REED and ROBINSON C. WALKER v. THE PHILA- DELPHIA, WILMINGTON AND BALTIMORE RAILROAD COM- PANY.

AN arrangement between a railroad company and a committee of a Peach- Growers' Convention to run a special daily peach train during a peach

season over their road from this State to Philadelphia, so as to connect by a certain hour the same day with the railroad thence to New York, and deliver peaches there in time for the next morning's market, and afterward advertised by the company by handbills posted at the stations on the road prior to the commencement of the season, to be so run with the design to make such connection at Philadelphia, will not constitute a special contract on the part of the company with the peach growers of the State, or with any one, to transport peaches during the season by such train; but only such a contract as the law applicable to common carriers raises in such a case, and therefore the company was not liable for any peaches which were not accepted by it for transportation by such train.

Nor was the company liable for work and labor of hands furnished by the shipper in loading the cars at a station with such of his peaches as were shipped from it, if it was the custom of shippers to furnish the hands for that purpose, and the custom was acquiesced in by the shippers. The company was a common carrier of goods in the case, and as to peaches that were delivered to, and accepted by, it for transportation by such train, was responsible as such for all losses and injuries thereto, except such as were caused by act of God, the public enemy, and the default of the shipper himself. The care and diligence required in such case is to be measured in a great degree by the character of the goods to be transported, and its liability may be greater or less according to the condition of them when received by it, for they ought to be in a suitable condition and a proper state of preparation for transportation when delivered and accepted for it. This obligation is imposed upon the Company as a public duty and by its undertaking to carry safely, as far as human care and foresight will admit. These obligations impose on the carrier the duty to carry and safely deliver the goods in good order and in a reasonable time at the place of their destination, and nothing will exempt the company as such from this responsibility, except as before stated.

But the principle on which the extraordinary liability of common carriers is founded, does not extend the responsibility to the time occupied in the transportation of them, unless they expressly contract to deliver them within a given time; but if they do so bind themselves by special contract, they are obliged to deliver at all events at the specified time, although the delay may be occasioned by inevitable accident or necessity beyond the control of human care or foresight. In the absence, however, of a special contract to deliver on time, they are bound to use due care and diligence to complete the transportation within a reasonable time, having regard to the character of the goods and the necessity of its speedy delivery at the place of destination.

In this case, the company having put forth a public handbill indicating the time for the train to leave Dover and about the time it was to reach Philadelphia, was bound to use due diligence, care and skill, and to exert all the means in its power to make the time mentioned in it for its arriv-

23

al there. And for the same reason that it was not responsible for the natural decay of the fruit in transit, it is held to a stricter degree of care and diligence for the transportation and delivery of it at the time specified.

Ordinarily the delivery of goods to a railroad company is made at its stations to a freight agent. To constitute a delivery to, and an acceptance by, the company as common carriers, it must appear that the peaches which were not carried away by it were in its possession, and that it had assumed the exclusive custody and control over them, and that the plaintiffs had at the same time parted with and entirely surrendered their possession and control over them. If there was not such a delivery, the relation of consignor and carrier did not exist between the parties.

If there was any negligence or default on the part of the Camden and Amboy Railroad Company which resulted in loss and injury to the plaintiffs, the defendants were not in any way responsible for it, because the engagements of the former, formed no part of the obligations of the latter, unless they made themselves so responsible by express agreement. If they engaged or undertook, as common carriers, to carry and deliver peaches beyond the terminus of their road, they would be bound to do so, and would be liable for the consequences of their default in that respect.

The peaches which the company accepted and undertook to carry, established the relation of carrier and consignor between it and the plaintiffs, and the responsibility of a common carrier attached to it on receiving them for transportation, notwithstanding the advertisement excepted Saturdays and Sundays as days for the running of the train.

Whether the defendants as common carriers were bound to receive and carry the plaintiff's peaches without prepayment or tender of the freight upon them, would depend upon the custom of the company in that respect, which was a fact for the jury to determine.

If it appeared that the loss and injury complained of by the plaintiffs was caused partly by their own negligence and partly by the negligence of the defendants, they cannot recover, unless by ordinary care the plaintiffs could not have avoided the consequences of the negligence of the defendants.

THIS was an action of assumpsit tried before Wootten and Wales, Justices, Gilpin, C. J., not sitting, in which Elias S. Reed and Robinson C. Walker were plaintiffs, and the Philadelphia, Wilmington and Baltimore Railroad Company were defendants, for the breach of an alleged agreement with them to transport for them all the peaches they should deliver for the purpose, at the railroad station of the company at Dover during the peach season of the

year 1864, from said station to Washington Street wharf
in the city of Philadelphia, and to run each day (Saturdays
and Sundays excepted) during said season sufficient cars
over the railroads of the company for that purpose, to
leave Dover each day as aforesaid at fifteen minutes before
five o'clock P. M. and to arrive at Washington street
wharf in Philadelphia by half past nine o'clock the same
evening, and which agreement, as they alleged, was indi-
cated and expressed in the following statement of facts and
circumstances: In the month of May 1864, a convention of
the peach-growers of the State was held in Dover for the
purpose of making an arrangement for the transportation
of peaches by railroad from this State through Philadel-
phia to the city of New York, in which a committee con-
sisting of several members of it, was appointed to confer
with the President of the Philadelphia, Wilmington and
Baltimore Railroad Company for that purpose, and which
committee soon afterward called upon him and apprised
him of their appointment and the object of their mission,
when he informed them that he was willing to afford the
peach-growers, whom they represented, the facility and ac-
commodation indicated and desired by them, and that he
would do all that lay in his power to accomplish the object
which they had in view, but at the same time advised them
to visit the President of the Camden and Amboy Railroad
Company and ascertain whether that company would be
willing to enter into the arrangement and unite with his
company in carrying it into effect, which they did, and re-
turning informed him that the latter company would carry
the peaches of the growers whom they represented, during
the season over their road daily from Washington Street
wharf, Philadelphia to New York, provided that ten car
loads, at least, should be delivered to them at Washington
street wharf by half past nine o'clock, P. M. each day, and
upon which he entered into a more extended conversation
with them on the subject and seemed anxious to ascertain,
and made particular inquiries of them to learn what would
probably be the amount of the forthcoming crop to be car-

ried during the season to New York by the arrangement
which they proposed to make, in order to determine what
number of cars it would be necessary for his company to
provide and furnish daily for the purpose, to which they
replied that the estimate of the members of the convention
was, that it would not be less than double the amount
shipped the preceding season, which was three hundred
and sixteen thousand baskets, but one member had ex-
pressed the opinion that it would amount to a million of
baskets. He thereupon assured them that an extra train
of sixty good cars suitable for the purpose, should be run
daily during the season, as soon as the shipment of them
should commence, to leave Dover and arrive at Washing-
ton street wharf, Philadelphia, at the respective hours be-
fore mentioned. He further stated that he would expect
the Camden and Amboy Railroad Company to furnish their
proportion of cars according to the number of miles to
be run over the roads of the companies respectively,
which would make their number a little larger than his
company's, and he had no doubt that company would
do it, but that he would attend to that matter, and
with that he would be able to carry, and would carry all
their peaches according to the arrangement without any
difficulty ; but this was said and this assurance given by
him on the basis of the estimate furnished by the committee
that the amount of the crop of that season would not be
less than double that of the preceding year. The Camden
and Amboy Company, however, would not engage with
the committee to supply any particular number of cars for
the purpose, and furnished but twenty until late in the
shipping season, when they increased the number to forty
cars ; and before the shipping season commenced, the run-
ing of the extra train of cars for the purpose according to
the arrangement as to the time of leaving Dover and
reaching Philadelphia, was duly advertised by handbills
posted at all the stations on their railroad through the peach
growing sections of the State. The action of the plaintiffs
was upon the alleged failure of the defendants to receive

and carry for them pursuant to this arrangement so made and advertised, forty eight thousand six hundred and eighty baskets of peaches delivered by them during the season at their railroad station at Dover, a considerable portion of which it was alleged, the defendants did not receive on their extra train of cars the days they were delivered, although always delivered there in time for shipment the same day, and the balance of which, although received pursuant to the arrangement, it was alleged they had failed to carry in time to Washington street wharf, Philadelphia. For the defendants, it was proved that the aggregate numner of baskets of peaches carried over their road during the season exceeded seven hundred thousand baskets. It was also proved on behalf of the plaintiffs that in consequence of the alleged failures on part of the defendants, they were obliged to ship about eight thousand baskets of their peaches by Adams & Co's Express to New York, at a greater cost of transportation.

*E. Saulsbury, for the plaintiffs.* Upon the facts proved it was both the duty and the engagement of the company, through their President of it, Mr. Felton, to furnish a sufficient number of cars for the purpose contemplated by the peach growers of the State at the time the arrangement was made by him, and to secure the proportion due from the Camden and Amboy Railroad Company, and which should have been contributed by that company for the purpose, and if he was unable to do that, then his own company was bound by his assurance and contract to supply the deficiency ; for his assurance to the committee after the arrangement had been made by them with that company, and they had consented to unite with his company in the transportation of them to New York, was that the peaches from Delaware should be carried as proposed and desired by the growers of them. But the deficiency in that respect was not alone the fault of the Camden and Amboy Company, because, instead of a train of but one hundred cars a day, the utmost he contemplated,

it would have taken a train of, at least, one hundred and twenty cars a day to carry off the peach crop of that season. But the requirement contained in the advertisement or handbill published and posted along their railroad in the month of July preceding the shipments which commenced early in August that year, that " peaches must be delivered at depots or stations an hour before the time for the trains starting therefrom," when complied with by a shipper, not only constituted a contract, but a special contract with him on the part of the company, to carry every peach delivered by him to the point designated in it, Washington Street Wharf in the City of Philadelphia, by half past nine o'clock P. M. the same day, but which the evidence showed had scarcely been done in a single instance during the season. The plaintiffs had proved that they delivered at their depot in Dover by the time required and generally an hour or more sooner than required, for transportation by the extra train advertised for the purpose, about forty eight thousand baskets of peaches, and that often as many as a thousand and more a day were left over for the want of sufficient cars to take them the day they were delivered, and by reason of which hundreds of baskets rotted upon their hands, whilst a very large proportion of even those which were shipped, owing to the fact that the train was invariably behind the time for leaving Dover, rarely, if ever reached their destination in time, either in Philadelphia or New York, and the latter city in particular, in time for the morning market the next day, in consequence of which, they had to be sold at the lowest prices, entailing heavy losses upon them, and of course those which had to be held over at the depot here for the want of cars, to await shipment the next day, had but to share for the same reasons, the fate of the former, and had to go into market in the same manner, and be sold at a still greater and more ruinous sacrifice. The defence, however, might be set up that such as had not been shipped on the railroad, although taken to the depot for that purpose, had not been delivered to, or received by the company, and therefore it

was not responsible for any loss which had been sustained on account of that portion of them. But it had been proved in the case that a portion of the warehouse at the depot of the company had been specially assigned by the agent of it to the plaintiffs for the storage and reception of their peaches, until they could have the cars there to put them in ; because it was also proved that it was a matter of daily and constant occurence for the company not only to be without a solitary car upon the siding at the depot to put theirs or any body else's fruit in previous to the arrival of the train from below, but not enough in the train on its arrival there to carry off more than a half to two-thirds of the quantity awaiting shipment by them, and in consequence of being uniformly behind their schedule time for starting from it, such would be the hurry and flurry and the impetuous haste to make their shiftings and leave there just as soon as possible, that they would often bump the cars with such violence as to upset the baskets in them, and get away before the shippers waiting there impatiently for them, could get enough of their fruit on board to fill up whatever little vacant space or room might be left on board of them. Well, such being the case, it was certainly but the exercise of a sound and reasonable discretion and presumed authority on the part of the agent of the company, to assign to such shippers as the plaintiffs were, any vacant portion of the warehouse of the company for the storage and protection of their peaches whilst thus delayed at the depot, and that in contemplation of law, would constitute beyond all doubt, a delivery to, and a reception of it by the company, without paying the freight for them, until there were cars there to put them in. 20 *Conn.* 354. *Add. on Contr.* 889. For when goods are delivered in a place proposed by the common carrier, or his agent, which is the same in effect, it was a sufficient delivery to bind him. *Chit. on Carriers,* 88, *note* 1. As to the liability of the company in general for any and every loss sustained by the plaintiffs under all the facts and circumstances proved in the case, the broad and stringent princi-

ple was well settled, and on that he should rely for an adequate verdict of the jury in such a case in favor of the plaintiffs, and that principle was as follows : a common carrier who has received goods to be carried by him, is regarded in law in the light of an insurer of their safety from danger, or loss, and is bound to exercise the strictest care and diligence in carrying them, and nothing will excuse or relieve him from this stringent duty and obligation, but the act of God, or the public enemy. *McHenry v. Phila. Wil. & Balt. R. R. Co.* 4 *Harr.* 448. In addition to what he had before said on that subject, he would specially call the attention of the jury to one or two more facts proved and which he had not before mentioned. It was the fact proved that on the 4th of August and again on the 10th of that month, there were no cars and no train whatever at Dover pursuant to the arrangement and the advertisement of it, whilst it was also proved that on the latter day the plaintiffs had a large quantity of fruit for shipment at the depot here, and which in consequence of it, depreciated so much upon their hands, that they were obliged to dispose of a large portion of it in another manner, and of course, at much below their actual cost. It was likewise proved that the company had upon the road but sixteen peach cars per day up to the 16th of August. That four more were put on by the 20th and that the Camden and Amboy Company put on some in the month of September toward the close of the season. That the company was so in the habit of overloading their trains and adding loaded cars to it as it proceeded up the road, that on one occasion, at least, their engine proved too weak in the knees to pull it up the grade between Wilmington and New Castle, when it had to be divided and one half run on to Wilmington and the other left behind until they could come back for it, and therefore it was not at all surprising that their trains never reached Washington street wharf by half-past nine o'clock in the evening; he was bold to say so, because the defendants had not proved that it ever did it. As to the measure of the damages to be awarded to the plaintiffs, the rule

was well settled and is stated in these few words, the value of the goods delivered to a common carrier to be carried by him, but not carried and delivered by him, at the place of their destination, is the measure of the damage for which he is liable. *Sedw. on Dama.* 356. As to that portion of the peaches of the plaintiffs which were delivered in New York, it had been proved that they sold for from fifty to seventy five cents per basket less than they would have sold for in that market, if they had reached there in time and according to the schedule fixed for the arrival of the train. The residue delivered by them at the depot here but not carried away by the company, if they had been carried in time, as they should have been, to that city also, would have sold, according to the evidence and the varieties of them, at an average price of one dollar and fifty cents per basket; the freight and commissions on them would have been forty cents, which with the amount they received for that portion which they were constrained to and were able to sell here at any price however insignificant, are to be deducted, of course, from the aggregate amount for which they would have sold at that average rate, and the balance was the amount of the damage to which the plaintiffs were entitled for the loss they had sustained on them. They were also entitled to recover the difference between what they had to pay to the Express Company for the eight thousand baskets which they were obliged to ship in that manner, and what they would have had to pay in freight to the defendants, if they could have shipped the same by their extra train, and which difference was ten cents per basket. *Sedw. on Dama.* 356. The plaintiffs themselves compute their total loss on the several grounds just stated, at twenty-one thousand and twenty-five dollars.

*D. M. Bates, for the defendants.* There were two great questions on which the claim of the plaintiffs depended, and the first was whether the defendants were liable for the loss of the peaches left at the Dover depot. The plaintiffs

24

alleged that they were so liable, because they were deliv-
ered to them, and in the next place that they were so lia-
ble, because they refused to accept them, two very contra-
dictory and irreconcilable grounds apparent upon the
mere statement of them. The difference between those
delivered and accepted, and those which were taken to the
depot, but not accepted by the company, was alleged by
the plaintiffs to amount to about fifteen thousand baskets. ·
What constituted a delivery to, or an acceptance of goods
by, a common carrier (for they were one and the same
thing) was this : they must come into his custody and pos-
session with an unqualified undertaking on his part at all
events to carry them. As a general thing, he was prepared
to admit, that a deposit of goods in a warehouse of the
carrier, was indicative of a purpose on his part to carry
them, and would amount to a delivery of the goods to him
to be carried, and would imply a contract on his part to
carry them. But to do that, it must appear that there was
a complete delivery to him and a complete acceptance of
the goods by him, and an unqualified undertaking by him
to carry them. For the principle or rule of law on the
subject was, if the goods are deposited in a warehouse of
the carrier with an unqualified undertaking on his part to
carry or forward them, it will constitute a delivery to and
an acceptance by him as a carrier. *Ang. on Carr.* secs. 129,
130, 131, 134, 136. If the goods are deposited in the office
or depot of the carrier and entirely relinquished by the
owner to his possession, it will constitute a delivery of the
goods to him as a carrier. 2 *Pars. on Contr.* 179. It was
not only a fact well and universally known throughout the
State, but it had been distinctly proved in the case, that
the peach crop of 1864 far transcended on the first of Au-
gust by more than double the amount of the best estimate
which the peach growers in convention assembled to devise,
and the committee appointed to propose the arrangement
to the defendants to carry their peaches by an entirely new
method to the city of New York, could present to Mr. Fel-
ton, the President of the company, when they for the first

time so late as the month of May preceding waited upon him for that purpose, and could any juror in the box, or any person out of it suppose, with all the proof before him which had been elicited in the case on that point, and of the immense and overwhelming amount of peaches which were daily coming in and accumulating at the Dover depot during the months of August and September in that year, that Mr. Walker, or any other agent of the company not entirely bereft of his senses, would have been so inconsiderate and unmindful of his duty, or so unfaithful to the trust reposed in him by the company under such circumstances, and when he already knew the utter inability of the company to meet such a sudden and unexpected demand upon them, as to accept and undertake to carry all the peaches which were then pouring in upon him in such a flood at the depot? On the contrary, was it not evident from the fact proved, that he was every day moving around among the owners and shippers of them at the station, notifying them in advance, what quantity of baskets he would be able to ship for them respectively, having inavoidably to disappoint in that way the hopes and expectations of all others, as well as the plaintiffs, that he did not, and could not, have intended to accept, or to undertake to carry such as he knew must necessarily be left over, and which he had actually informed them at the time, the company could not carry, and which they knew, just as well as he did, it could not carry? Besides, it had been proved that there was no warehouse, or any other building provided or kept by the company at the depot for the reception or storage of peaches, and that its uniform practice was to require the shippers to put their fruit themselves from their wagons into the cars, or if they were so transferred in the first place to their open platforms or depot grounds, they should afterward put them in their cars; and the company therefore never considered that it assumed any possession or custody of them, or had incurred any liability on account of them until they were put in their cars, and, of course, such being the uniform and established practice

and custom of the company and as uniformly recognized
and acquiesced in by the shippers and the public generally,
there could not be either in point of law or in fact in such
a case, any delivery of them to the company, or any accept-
ance of them by the company, in their character and ca-
pacity as common carriers, until the plaintiff's peaches were
so delivered on board their cars.  But the evidence of Mr.
Walker, the agent himself, in regard to the matter, had
settled that question conclusively, he considered; for his
testimony was that he not only had no instructions or au-
thority from the company to receive or store peaches in
the warehouse, but that portion of it being at the time un-
occupied, as a matter of convenience and accommodation
to the plaintiffs, he had merely given them his permission
to put them there, where they could overhaul and cull them,
and select out such as would do afterward to ship from
such as would not, and that they retained the custody,
control, and supervision of them and even had guards of
their own to watch over them by night, so that it clearly
appeared that instead of being delivered to, or received or
accepted by him, they still continued in their own control
and in their own immediate custody and possession all the
time for the purpose of being prepared for delivery and
shipment afterward.   He would, however, in regard to the
matter ask the court to instruct the jury that there is no
techincal rule in law to determine what constitutes a deliv-
ery of goods to, or an acceptance of them by, a common
carrier, and that unless the peaches of the plaintiffs in this
case were delivered to the company, and placed in their
exclusive possession, or under their exclusive control, and
were accepted by them with an undertaking to carry them
at all events, there was no delivery of them to the compa-
ny.   Also to instruct them that in order to entitle the
plaintiff to recover for a refusal by the company as a com-
mon carrier to carry them, it was necessary for them to
allege in their declaration and to prove on the trial, that
they tendered to the company the freight upon them, and
unless such a tender had been proved, they were not enti-

tled to recover for any refusal of the company to accept and carry them. But he would go further and also ask the court to charge the jury that no special contract between the plaintiffs and the defendants to accept and carry all the peaches they had that season at the Dover depot, had been proved in the case, and without proof of such a special contract between the parties to the action, there could not have been a contract of any kind whatever, either express or implied, between them to do so, because it takes two parties to make a contract of either kind, who must be mutually and respectively bound by it, and each of whom must perform his or their respective parts of it. But in this case, under the arrangement made by the committee of the convention of peach-growers with the company for running a through train for the transportation of peaches from this State to the city of New York, none of the peach-growers even, much less the plaintiffs who were but buyers and not growers of them, entered into, or were bound by any contract, either express or implied, to ship a solitary basket of peaches by such through trains of the company, and, of course, if neither the plaintiffs, nor any body else, were parties on the other side to such a supposed and visionary conception of a contract of some kind or another, but were in truth no parties to, nor bound to perform any contract known to the law in such a case, they could not pretend to claim that the company was bound by any contract whatever with them, in regard to that particular matter. The extent of the legal obligation of the company in such a case was simply, and nothing more than their ordinary duty and legal liability as a common carrier, to carry to the extent of its ability, the peaches of the season for the growers and owners of them in general, pursuant to its public advertisement with due care and diligence.

The second great question was what was the extent of the obligation and liability of the defendants in regard to the transportation of so much of the peaches of the plaintiffs as were delivered to and accepted by the company, and which it undertook to carry? That was to be ascertained

and determined by the terms, effect and meaning of their undertaking in that particular ; and that in turn was to be ascertained and determined from the public advertisement which it distributed and posted along the line of the railroad, and by which it gave public notice of the special train that would be run, the purpose for which, and the time when, it would be run, &c. That was the only engagement, and that comprised the whole measure and extent of the engagement and the obligation which was entered into and assumed by the company in regard to the matter. The advertisement was to the following effect : "During the peach season of 1864, commencing Monday, Aug. 1st, a special train will be run daily, Saturday and Sunday excepted, between Harrington and Philadelphia for the transportation of perishable fruit. To leave Harrington after the arrival of trains from Salisbury and Milford, at 3.25 P. M., Felton 3.50, Canterbury 4.00, Willow Grove 4.05, Camden 4.20, Dover 4.45," and so on with the respective hours designated for leaving the stations above on the road, and then adds, " and is designed to reach Philadelphia with peaches &c. from Salisbury and Milford ·and intermediate points about 9.30 P. M., in season for cars that may have been fully loaded for New York, to go through to Jersey City in time for next morning's market, on terms and conditions agreed upon by committee of peach-growers with the Camden and Amboy and New Jersey Railroad Companies." That was all which had any relation to the train in question, except that it closed with the requisition that peaches should be delivered at the several stations before the time for the train to leave.   But it would be observed that there was not one word in it about any agreement, or any terms, or conditions made by the committee of the peach-growers, with the Philadelphia, Wilmington and Baltimore Railroad Company, and no one reading it could ever have inferred or supposed from any thing contained in it, that the defendants had concluded to advertise and run the train in fulfillment of any agreement whatever with them, or any other persons.   In fact and in truth the President,

Mr. Felton never regarded the arrangement in the light of a formal and imperative contract that would legally bind and obligate any one to comply with it, or to perform it; for as he well knew that the arrangement and the running of the train in conformity with it, would not bind any peach-growers, nor any member of the committee even, to ship their peaches by it, he did not suppose that any one could consider it in the light of a contract on the part of the company, and least of all, to carry at all events, all the peaches that might be grown in the State that season by such trains. On the contrary, he entered into it upon the invitation of the committee, in that spirit of accommodation which is usual on the part of the Presidents of such companies when applied to for such increased facilities by shippers on their roads, whenever they can do so without any sacrifice or serious inconvenience to their companies, and just as he would have put on any other special train upon his road for the accommodation of any other class of shippers upon their application and assurance that their interests required it, and the amount of their business would justify it on his part.

He thought he had now said enough to clearly demonstrate the fallacy of the idea that there was any thing in the nature of either an express or an implied contract on the part of the defendants, to carry by the trains referred to, all the peaches that could possibly be brought to their road that season for shipment to the city of New York, or that the President of the company ever engaged or undertook to do so, to be found in, or based upon such a transaction. After the particular inquiries which he was careful to make of the committee at the very inception of the arrangement, to ascertain their own and the best estimate of the convention of peach-growers from which they had just come, as to the probable amount of the whole crop of the State that season, in order that he might make the proper and necessary preparations to carry, not all, (for he must have known that some portions of it would seek other markets) but a large proportion of it by the method

proposed by them to New York, and the general and most reliable estimate which he could obtain from them was only about six hundred to seven hundred thousand baskets, and it had been distinctly proved on the trial that notwithstanding all the complaints which had been heard from the plaintiffs in this action, of the inadequate provision made by the defendants for the purpose, and their alleged dereliction of duty as common carriers in the premises, they after all, carried by the train in question more than seven hundred thousand baskets for the peach-growers of the State to the city of New York. And if any body was to blame for their not carrying nearly double that quantity, who could it be but the peach-growers themselves as represented in that convention, or perhaps, their very intelligent committee, who should have informed themselves better in regard to the matter before the shipping season commenced, and apprised the company in time of the egregious error into which both they and the whole convention had fallen in relation to the prospective yield of season. And after all this had occurred and all this had been done by the company under such circumstances, what reasonable man could possibly complain of it with the slightest show of justice, if the great and wholly unexpected excess of the production of the season could not be carried by it with means prepared to carry but little more than one-half of it? He would therefore repeat that the only obligation which rested upon the defendants in the case, was that general duty which the law imposed upon a common carrier in any case; and that liability it was well known, was of a two-fold character and description which differed very much in their nature and degree. For the safety and delivery of goods which he has undertaken to carry, he is absolutely bound by the policy of the law, which regards him in the light of an insurer against their loss, and so stringent and imperative is the obligation which the law imposes upon him in that respect, that he is bound for the loss of them at all events. But as to their delivery by him on time, or within time, at their destina-

tion, the liability and obligation was wholly different, and much less stringent, as it obviously should be, because the consequences of the breach of it, were much less serious and fatal in their character, and therefore the law does not regard him as an insurer against detention or delay merely in the delivery of them; but liability for that can only result from contract, and special contract too, between the parties to it, when the time for delivery is of the essence of such special contract. *Pierce on Railroad Law* 411. *Ang. on Carr.* 289. And no general public advertisement such as had been proved and shown here, could of itself merely, prove or establish such a special contract between the parties in the present case.

*Gordon for the same.* During the peach season of 1864 the plaintiffs purchased a large quantity of peaches, amounting as they alleged to near fifty thousand baskets, all of which were brought to the Dover depot for shipment over the railroad of the defendants by the special train of that season to the city of New York, a portion of which it seemed, they entirely failed to get off by any method over the road, another portion of which they were obliged to ship by express over it to that city at an increased expense to them, and another portion of which they succeeded in getting off by the special train referred to, but which they alleged and complained was not carried in time to Philadelphia and New York, in consequence of which they had sustained, according to their own allegation, heavy damages. Their claim, therefore, to recover, rested upon those three distinct and separate grounds of action in the case, and it was all based upon the ground as they contended, that the defendants were bound by contract to carry within certain prescribed hours to Philadelphia and New York, not only all their peaches brought to the Dover depot for such shipment, but also all the peaches of every other person in the State who had taken them to any station on the railroad of the company within the limits of the whole peach producing district of it during that sea-

son. But the defendants denied that they ever entered into any such contract either express or implied with the plaintiffs, or any body else, to do any such thing. Enough had already been said about the proposition submitted through their committee by the peach-growers convention held in the month of May in that year, and assented to by Mr. Felton, the President of the company, to run a special through train from this State to New York, with the concurrence and co-operation of the New Jersey Railroad Companies, for the daily transportation of their peaches that season to that market, and the evidence in regard to it was so clear and complete, that he would not waste any time in commenting upon it, except to say that if any man could make what is known in law, as a contract between two or more parties either express or implied, out of any or all of the repeated interviews and conversations which occurred between him and members of the committee in regard to the special favor and accommodation which they were so importunately soliciting at his hands, to carry one single basket of peaches for them in that particular manner, it could not possibly be to carry at the utmost, over six hundred and thirty-two thousand baskets in all during that season; for when he instituted the inquiry which, of course, was the first practical step for him to take in the business, to ascertain how many baskets he would have to get ready between that time and the first of August ensuing to carry during the season for the peach-growers of the State to New York in the mode proposed by them, there was not one of the committee who believed or would pretend to say that it would exceed double the quantity shipped the preceding year, which was three hundred and sixteen thousand baskets, and which doubled made their estimate for that season six hundred and thirty two thousand baskets. It had, however, been distinctly proved by facts and figures, and would not be denied by the plaintiffs or their counsel, that notwithstanding the grossly mistaken and deceptive estimate of the committee, the company actually transported out of the State during that season a

sum total of seven hundred and thirty three thousand
baskets of peaches, and in which was carried thirty-three
thousand baskets for the plaintiffs, eight thousand to the
market of Philadelphia, and the balance to New York by
the special line run pursuant to the special request of that
committee and the peach-growers whom they represented.
The exact number carried to the two markets before men-
tioned by the company for the plaintiffs was thirty three
thousand twenty two hundred and fifty baskets, and about
seventeen thousand of which it had been proved reached
the respective cities to which they were consigned in time
for what are termed their first or early morning markets,
that of the latter city having been proved to be from four
to eight o'clock A. M.  But there was nothing said, much
less stipulated in the advertisement of the train about what
is termed the early morning market, for the expression in
it simply was in time for the morning market, and that
had likewise been proved to continue until noon, and that
what they term their afternoon market, was from that to
two or three o'clock P. M. ; and the balance of the plain-
tiffs' peaches shipped to that city, consisting of eleven hun-
dred and twelve baskets, it had been clearly shown and
proved, reached there and were in market by noon the
ensuing day.  As to the residue of the plaintiffs' fruit
which in the unprecedented, unexpected and overwhelming
rush to the Dover depot in particular, during the greater
part of the season, where the plaintiffs still persisted in
buying them, from all directions far and near, after they
well knew of the utter impossibility of getting them all
away by any or all the lines or cars which the company
could possibly prepare or procure for the transportation
of them, he would only add to what his colleague had so
well said on that point, that there was abundant evidence
before the jury to show that as soon as the President of
the company, Mr. Felton, was apprised of this embarrass-
ment on the road and of the gross and egregious blunder
of the committee in their prospective estimate of the crop
of the season, he made every effort in his power to remedy

the difficulty, and put on every additional car, besides the sixty he had already prepared and had in service according to the estimate, which he could then possibly command for the purpose. It was also proved that whilst he had supplied the full complement of his company, the Camden and Amboy company had failed until late in the season to comply with its arrangement with the committee, and to supply its quota of cars for the same purpose; and he should therefore conclude with the confident conviction in his own mind, under all the facts and circumstances proved in the case, that neither the court or the jury would consider that there was any contract on the part of the defendant with the plaintiffs in the case, or any body else, or that there was any obligation or liability in law resting upon them as common carriers merely in the case, which bound the company to transport or carry over its road one peach more than it had in fact carried during that season. It was also clearly and decidedly proved by the testimony of competent and disinterested witnesses, that much of their fruit was not merchantable, some of it having been picked too green, and other portions of it much too ripe for shipment, even when it arrived at the depot, and the loss and depreciation in the price of it in the market was doubtless largely attributable to that fact; and for any such loss on such fruit, the defendants, of course, were not liable. *Ang. on Carr.* 212. As to the alleged delay and failure of the trains over the connecting roads to deliver the fruit in time, of which so much complaint had been made in the present case, the only legal question involved in it was this : was the train in question conducted and operated so as to deliver it with due diligence and dispatch under all the facts and circumstances proved in the case, having in view particularly, the immense and unexpected quantity which was thrown daily upon their hands at almost every station on their road during the whole season nearly ? Was there any negligence or want of due and proper diligence on the part of the servants of the company in its undertaking to carry and deliver the peaches of the plaintiffs within the

times designated in their advertisements? If not, then the defendants were not liable for any delay which might have occurred in the delivery of them. Because it had been expressly ruled and decided 'in this country that if a railroad is well equipped for a freighting business, and a delay occurs in the transportation of goods by an unusual influx of business beyond the immediate capacity to get it off, and the goods are transported as expeditiously as is practicable in the existing condition of the road and the business, due diligence will be considered as having been used, and the railroad company will not be liable for any damage. *Wilbert v. New York and Erie Railroad Co.* 19 *Barb.* 36. In that case the court said that common carriers are held to a much stricter liability for an entire failure to deliver goods they carry, than for the time occupied in transporting them, and that the liability for delay merely in delivering them rests upon other principles, and as to the time of delivery, their liability was the same as that of other bailees for hire. It also observed in reference to the case, that the railroad company did all it could do, but the property offered for transportation at the time was more than could be transported on the road. The corporation should provide a reasonable equipment for their road considering the amount of business to be done by it. They should expect that more business would offer at some times than at others, and they should therefore have a reasonable supply of cars and engines; but they were not bound to provide for a great, sudden and unexpected influx of business, so as to prevent all accumulations. And in regard to the measure of damages demanded by the plaintiffs in the present action, he would also further read from the same case, what was ruled on that point, which was as follows : in an action against a railroad company for negligence in conveying a large quantity of butter to market within a reasonable time, the plaintiff cannot recover as damages, the difference between the price of butter at the time it should have been delivered, and the price of it at the time when the butter in question was delivered.

*Comegys for the plaintiffs.* The facts proved in the case established a complete contract in law between the company and the plaintiffs to carry their peaches delivered to the company at the Dover depot within the time designated in the advertisement of the running of the special train referred to in it, and he would therefore ask the court to charge the jury that if they believed from the evidence in regard to the matter, that an arrangement was entered into between Mr. Felton, the President of the company, and the committee of the convention of peach-growers in the State, for the transportation of the crop of that year to the market of New York, and the company afterward made preparations for it, and undertook to carry it into effect, it constituted a contract between the company and any peach owner in the State at that season who sought to avail himself of the advantage of it by delivering his peaches at any station on the road for the purpose, for the transportation and carriage of them to the market designated within a reasonable time, and that what would constitute the reasonable time in such a case would be the time afterward fixed and determined upon and advertised by the company for the delivery of them.

As to the question which had been raised on the other side, what would constitute in contemplation of law a delivery by the plaintiffs of their peaches to the company, as common carriers of such perishable fruit, it was not easy perhaps, to answer and define it in general terms, but he would attempt to do so, and would say it was a transfer of the possession of them to the common carrier with his consent, and a delivery of them in the warehouse or on the railroad platform of the company with its consent, to be carried by it, was a delivery of them to, and an acceptance of them by, the company in its character as a common carrier, to be carried by it. In regard to that matter, the proof in the first place was that Mr. Walker, the agent of the company, set apart and assigned a portion of one of their warehouses at the depot and immediately on the line of the railroad at this place, for the de-

posit of their peaches, and which were deposited in it by them pursuant to such assignment. In the next place it was proved that when there was no more room in it for their peaches, they, as well as others, applied to him to know where they should be put, when he specially pointed out the places where they should be put, and such places as he deemed most suitable and convenient for getting them into the cars, which were immediately along side of the railroad track. And in that connection to show that such a deposit under the express directions of the agent of the company, was a delivery of them to the company as common carriers, it was the legal duty and obligation of the company to load their own cars, and they were bound in law to employ whatever hands were necessary to transfer them from such warehouse, platforms or other places on the sides of the road, where they had been so delivered to the agent, to their cars. For the company was clearly bound in law to perform that service, and the cheap practice into which it had fallen of late, of requiring and exacting of every shipper of peaches to put his own fruit into their cars, could not release the company from its legal liability and obligation to perform that service and that duty at their own expense. The next matter of proof in the same connection to which he would call the attention of the court, was contained in the last sentence of the advertisement. " Peaches must be delivered at stations one hour before train's time to leave." " Peaches must be delivered," it says, at stations one hour before the time for the train to leave. Delivered to whom does it mean, if not to the company, or its agent at the station to receive them, an hour in advance of the departure of the train, which was the same thing ? And what could have been the motive or object of such a requirement on the part of the company, if it did not unquestionably mean that they must have them as common carriers in time to get them on their cars, without any detention or delay beyond the hour designated for the departure of the train and to get to market with them by the time stated in their adver-

tisement ? And what else could such words possibly
import, but that they must be in their possession by that
time, if they were required or expected to be carried away
from the station by them that day ? And if in their pos-
session, was it not a delivery to them the moment the
possession was theirs ? He would therefore further ask the
court to charge the jury in addition to the request which
he had before made, that all the peaches of the plaintiffs
which were at the Dover depot and in positions within
their grounds assigned or pointed out for them by the
agent of the company, on any day during that peach sea-
son, an hour before the time appointed for the special
train to leave there, and which had been so placed there
by them for shipment by such train, were both in point
of fact and in contemplation of law thereby delivered to
the company and were from that time in their possession as
common carriers for the purpose of being carried by them
on such train. And now, as to the liability of the defend-
ants for detention and delay in delivering such portion of
the peaches of the plaintiffs as they carried to market.
The time of arrival at Philadelphia and New York, as
well as the departure of the train from the depot here,
were expressly stated in the advertisement of the company
on which the contract between the parties in the case,
chiefly rested and depended ; and it being such a contract,
it was perfectly manifest that the delivery of the peaches,
depreciable and perishable as they are known from their
nature necessarily to be, to the consignees in New York,
was not only of the essence, but was really one of the
most essential elements of the contract, and when such is
the case, and such is the nature and character of it, a
breach of it in that particular, is just as grave and serious
a breach of it, as an infraction of it in any other respect
whatever, and for that reason the authorities cited on the
other side upon that point could have no application to
such a contract, or such a case as this.

*The Court, Wootten J., charged the jury,* after referring to

the facts of the case, that the plaintiffs claim that under this arrangement, they delivered to the defendants, during the peach season of eighteen hundred and sixty-four, at the depot in Dover, to be shipped for New York, forty-eight thousand, six hundred and eighty baskets of peaches, the value of which was from two dollars to two dollars and fifty cents per basket.   And they further allege, that twenty-five thousand baskets which were delivered in time and accepted by the defendants for transportation from the Depot at Dover to Washington street wharf in Philadelphia, were not taken from the Depot and safely and securely carried and conveyed from thence to Washington street wharf in Philadelphia, on the day of their delivery to and acceptance by the defendants for that purpose; but were suffered and permitted by the defendants to remain and lay over; and consequently the peaches contained in those baskets spoiled, rotted and were wholly lost.   And the plaintiffs further allege that they shipped to New York in the aggregate, forty thousand nine hundred and forty-three baskets of peaches, and that of this number five thousand three hundred and sixty-seven baskets were shipped in a damaged condition by reason of the negligence and delay of the defendants in not shipping them on the day of delivery to, and acceptance by them for that purpose. And the plaintiffs further allege that the defendants did not provide and put on suitable and a sufficient number of cars for the purpose of their undertaking, that is for the transportation of the peaches, which they undertook to carry and convey safely and securely from Dover to Philadelphia; that on some days, as the plaintiffs allege, there were no trains at all, and on other days, and generally, the trains were behind time, and that in consequence of the negligence of the defendants and the insufficiency of the motive power and other necessary means to carry the plaintiffs' peaches to their place of destination at Washington street wharf in Philadelphia in time to connect with the Camden and Amboy Railroad to New York, the plaintiffs lost the benefit of the market in New York the

next morning after the delivery of their peaches to the defendants and the shipment thereof at Dover. And the plaintiffs further say that there was great delay in the departure of the trains from Dover at the stipulated time, by reason often times of the failure of the train to arrive at Dover from below at the proper time, and also for the want of hands who ought to have been furnished by the defendants to load or to assist in loading the cars.

For these and other alleged grievances, losses and injuries, the plaintiffs claim damages of the defendants to the amount of twenty-one thousand and twenty-five dollars, with interest.

The plaintiffs' declaration contains twelve counts, presenting their case in almost every conceivable aspect as to the default of the defendants complained of. To refer to and explain all these different counts in the declaration would be but a useless consumption of time, without imparting to you any useful information in the discharge of your duty.

The defendants deny the plaintiffs' alleged cause of action, and set up by their pleas and rely upon various matters of defence as a bar to to the plaintiffs' right of recovery. They contend first, that there was no other agreement on their part for the transportation of peaches than that contained in the printed hand-bill, published by their agent, which is in evidence before you, and that they put on and run continuously during the season all the cars they agreed to furnish and run for the purpose.

*Second,* That they (the defendants) applied and used all the means in their power, and strove to the extent of their capacity to accommodate the class of persons whom they had undertaken to serve. That they gave the peach trains (as they were usually called) the preference over the regular freight trains, and also over the passenger trains, that the cars commenced running about the time specified in the printed hand-bill, published by their agent, and continued to run during the peach season, that is from the first of August to the last of September or first of October following, and that with but few exceptions they left the Depot

at Dover at four o'clock and forty-five minutes P. M., and arrived at the place of their destination, at Washington street wharf in Philadelphia, at or about half past nine o'clock P. M. of the same day. *Third*, That there was not sufficient time to deliver and ship the peaches by reason of the extraordinary quantity rushed in at the depot, morning, noon and night, greatly exceeding any representations that had been made to the defendants, and beyond their expectation and their capacity to carry them, and unfit for shipment, some too green and others too ripe, that they were all brought to the depot at Dover for shipment, and many of them from places nearer other depots.    That the agent of the defendants informed the plaintiffs that the defendants had exhausted all their means of transportation and were unable to do more, and urged the plaintiffs not to purchase any more peaches to be carried by them.    The defendants also insist that the New York market was sometimes glutted, that the losses of the plaintiffs arose from their own bad management in not having a sufficient number and careful and skillful hands to pick and deliver their fruit in proper condition for shipment, and not by the negligence or default of the defendants. *Fourth*, That they (the defendants) carried the full number of baskets of peaches which they were informed there would probably be for transportation from the State over their road.    *Fifth*, That when the trains failed to make time, it was not by reason of the negligence or default of the defendants; but for reasons entirely beyond their control.

These, gentlemen, are substantially the grounds on which the plaintiffs base their right or claim to recover, and those on which the defendants rest their defence.

I will now proceed to announce to you as concisely and intelligently as I am able, the law applicable to the several and respective branches of the case.

In respect to that portion of the plaintiffs' claim which rests on the assumption of a special contract on the part of the defendants, we have to say to you that we do not consider that any special contract has been proved. To constitute a special contract there must be mutual promises and undertakings obligatory on both parties, and before the one can require the other to comply with his engagements, he must be bound to fullfil his own obligations. It appears from the evidence, that Mr. Felton, the President of the company, promised the committee of the convention of the peach-growers of Delaware, that he would do all he could to provide ways and means for the transportation of their peaches, provided the Camden and Amboy Railroad company would co-operate and furnish their proportion of cars; but there is no evidence that the plaintiffs or any other person bound themselves to ship any peaches at all, and aside from the want of mutuality, which is essential to the validity of every special contract, according to the construction given to the alleged contract by the plaintiffs' counsel, the defendants were not bound by their proposition until it was accepted by the peach-growers by presenting their peaches to the defendants for shipment, and thereby making themselves parties to the contract—such a construction of the agreement or arrangement of the defendants would make it a separate and distinct contract on each and every delivery of peaches for transportation—in other words, there would have been as many contracts as there were different deliveries of peaches, each delivery constituting a distinct cause of action, in the events of default on the part of the defendants. But although no special contract, such as is contended for by the plaintiffs' counsel existed, it is perfectly true that each and every delivery and acceptance of peaches for transportation created a contract between the parties, not a special contract however growing out of the alleged arrangement made by Mr. Felton with the committee of the convention of peach-growers, or by the hand-bill published by the defendants, but such a contract as the law applicable to

common carriers raises in. all cases under like circumstances. But according to well settled principles of law, Mr. Felton had the right to withdraw his proposition at any time before it was accepted, and it seems that he did withdraw it, so far at least as it was changed or modified by the hand-bill published by the defendants, indicating their purpose and defining their proposition.

In this view of that branch of the case, we feel it our duty to say to you that no special contract has been proved in the cause, and therefore the plaintiffs cannot recover damages in this action for any loss they may have sustained on peaches, which were not accepted from them by the defendants for shipment, nor can they recover the difference of freight paid the Adams Express company, over and above what the defendants would have charged had they .carried the peaches that were carried by the express company—nor can they recover in this action for the work and labor furnished by them to load the cars and attend to the shipment of their peaches, there being no count in the declaration under which these items of charge can be recovered, supposing them to be recoverable at all; and we say further, that those items of charge claimed by the plaintiffs could not be recovered if the declaration contained suitable counts, if you should be satisfied from the evidence, that it was the custom of the shippers to furnish hands for that purpose, and the custom was acquiesced in by them.

This brings us to that branch of the case which involves the responsibility of the defendants on the ground of negligence and the want of due care and skill in the transportation and delivery of that portion of the plaintiffs' peaches, which were delivered to and accepted by the defendants for that purpose, and not safely carried and delivered at the place of destination in good order and in due time. It is alleged that forty thousand nine hundred and forty-three baskets were delivered to and accepted by the defendants for transportation, and the plaintiffs say that by reason of the negligence and want

of due care and skill on the part of the defendants in the transportation and delivery of these peaches, they spoiled, spotted and rotted, and consequently greatly depreciated in value to the great damage of the plaintiffs.

This necessarily leads us to the consideration of the law which fixes and defines the obligations of common carriers. Without entering into a general description of the term, it will be quite sufficient for the purposes of this case to say, that they (common carriers) consist of two classes—common carriers of goods, and common carriers of passengers for hire : and Railroad companies being incorporated by law for the transportation of persons and property over their respective roads for hire, are common carriers of both descriptions. These are the purposes for which they are created by law. It is their public employment, their direct duty and principal business, and not a casual or occasional occupation with them, and this it is that constitutes them common carriers of both the classes which I have described. There is a marked difference however between the obligations which the law imposes upon common carriers of goods and common carriers of persons; but as we are only considering their liabilities as carriers of goods, I will confine my remarks to the obligations, which the law imposes on them as such. Common carriers of goods are responsible for all losses and injuries thereto, except such as are caused by the act of God, the public enemy, and the default of the owner, even in the absence of negligence, because the law regards them as insurers against all losses and injuries arising from any other cause, whether they result from the want of necessary care, diligence and skill of their servants, or from the want of the necessary and proper means of conveyance and the conduct and management thereof; in this they are required to exercise every degree of care and diligence which a reasonable man would use, and which is in their power to exert—the care and diligence required is to be measured in a great degree by the character of the goods

they are transporting, and their liability may be greater or less, according to the condition of the property when received by them, which ought to be in a proper and suitable condition and state of preparation for transportation when delivered and accepted—this obligation is imposed on them as a public duty, and by their undertaking to carry safely, as far as human care and foresight will admit.

Railroad companies using as they do the powerful and dangerous agency of steam, are bound to provide skillful and careful servants, competent in every respect for the posts they are appointed to fill in their service, and are responsible not only for their possession of such care and skill, but for the continued and faithful application of these qualifications at all times. *Pierce on American Railroad law*, 469, 470, 471.

These obligations impose on the carrier the duty to carry and safely deliver the goods to the owner or consignee in good order and in reasonable time at the place of destination, and nothing will excuse or exempt them from this responsibility, except, as I have before said, the act of God, the public enemy, or default of the owner. What is meant by the act of God are causes from which loss ensues, and which no human care or foresight could prevent, being such as earthquakes, lightning, tempests and inundations. *Pierce on Am. Railroad law*, 410. And when defence is predicated on the existence of any of these causes, the *onus probandi* is on the defendant.

But the principle on which the extraordinary liability of common carriers is founded, does not extend the responsibility to the time occupied in the transportation, unless they expressly contract to deliver within a given time; if they do so obligate themselves by special contract, they are bound to deliver at all events at the specified time, although the delay may be occasioned by inevitable accident, or necessity beyond the control of human care or foresight. *Pierce on Am. Railroad law*, 412.

In the absence however of a special contract to deliver

on time they are bound to use due care and diligence to complete the transportation within a reasonable time, having regard to the character of the property, and the necessity of its speedy delivery at the place of destination  In this case it appears from the evidence, that the defendants put forth for the public eye, a hand bill indicating the arrangement they proposed for the accommo. dation of the peach-growers of Delaware, specifying the time of departure of their daily train from the different points or stations on the road.  The time thus indicated for departure from the depot at Dover was four o'clock and forty-five minutes P. M., and designed to arrive in Philadelphia at Washington street wharf about nine o'clock and thirty minutes P. M. of the same day—the defendants having thus held themselves out, and proposed so to accommodate the public, were bound to use due diligence, care and skill, and to exert all the means in their power to make the time mentioned in their hand bill for arrival at Washington street wharf in Philadelphia.  And for the same reason that they are not responsible for loss arising from the natural decay of the fruit while in transit, being of a perishable character, they are held to a stricter degree of care and diligence in the transportation and delivery at the specified time.

I now come to that branch of the case which involves the question of delivery by the plaintiffs of their peaches and their acceptance by the defendants for transportation. This matter has been much discussed and we have been requested to charge you in reference to it.  The liability of common carriers commences when the goods have been delivered to and accepted by them, or their agents.  Ordinarily the delivery to a Railroad company is made at its stations to a freight agent; but if it is the custom of the company to receive goods at some other place, its liability commences from the time of delivery and acceptance according to their custom.  As a general rule a delivery does not take effect so as to render the company responsible for a loss by a deposit of the goods

where the company are accustomed to receive them until such deposit has been made known to their authorized agents. *Pierce on American Railroad law*, 426, 426.

In order to charge the defendants as common carriers in this case, the plaintiffs' peaches must have been delivered to the defendants and accepted by them for transportation in their capacity as common carriers. And here the question arises as to the delivery which the plaintiffs allege they made of their peaches to the defendants to be carried from Dover to Philadelphia. It is a question of fact, gentlemen, and exclusively for your consideration. It is our duty however to instruct you as to what in law constitutes a delivery; but in doing so I do not purpose or desire to infringe upon your province by referring to the facts, except so far as may be necessary by way of illustration, and to enable me intelligibly to state the law.

It appears from the evidence that the plaintiffs occupied a portion of the defendant's warehouse as a place of deposit for their peaches, that they overhauled them while in this warehouse, picked and prepared them for transportation, sold and otherwise disposed of peaches that had been deposited there by them. And it is further proved that when the plaintiffs put their peaches on board the cars at the depot, they rendered an account of the number of baskets and crates to the authorized agent of the defendants, who thereupon made or caused to be made an entry thereof on the forwarding book of the defendants. In the discharge of our duty, which requires us to announce to you the law, we say to you, that to constitute a delivery to the defendants and an acceptance by them, they must have accepted the peaches in their character of common carriers and assumed the exclusive custody and control over them, the plaintiffs having at the same time parted with and entirely surrendered their possession and control over them. If there was not such a delivery the relation of consignor and carrier did not exist. If the plaintiffs merely used

27

the warehouse of the defendants as a matter of convenience to themselves as a place of deposit for their fruit to await transportation when it should be put in a proper condition or state of preparation for that purpose, or to take the chances for cars on which to ship it, no responsibility thereby attached to the defendants. The mere fact of the deposit of the peaches in that portion of the defendant's warehouse, which was in the exclusive possession of the plaintiffs, or on the platform, or side tracks of the Railroad, would not constitute such a delivery to, and acceptance by, the defendants as would fix their responsibility as common carriers. In other words, if the plaintiffs still held the possession and continued to exercise the exclusive control over the peaches until they were placed on the cars, and the agent of the defendants was furnished by the plaintiffs with the amount or quantity of baskets and crates shipped, the defendants are not responsible for any loss or injury that occurred before that time. 2 *Parsons on contracts. Pierce on American Railroad law*, 428, 429, 430. *Angell on Common Carriers* 129, 130, 131, 134. But if there was consent or an agreement on the part of the defendants, to consider and recognize a deposit in the warehouse occupied by the plaintiffs, or on the platform, or side tracks of the Railroad, a delivery to them and an acceptance by them, or if there was such an agreement, arrangement or understanding between the plaintiffs and the authorized agent of the defendants it would be a sufficient delivery and acceptance to fix the liability of the defendants, and their liability would commence from the time of such delivery or deposit. Whether such consent, agreement, arrangement or understanding has been proved, is a question of fact, which it is your province and duty to consider and determine, not ours, and when you have settled this question you will be enabled to enter upon the consideration of others depending in a great measure upon this one. If you should be satisfied from the evidence that there was such an agreement, arrangement or understanding between the parties, and

that under that arrangement the plaintiffs so delivered and · deposited peaches, the responsibility of common carriers attached to the defendants from the time of such delivery or deposit, and they thereupon became responsible for the transportation and safe delivery of the fruit in good condition and in due season as I have already stated and explained to you in reference to other aspects of the case. But if you should not be satisfied that such an agreement and arrangement was made and existed between the parties, the mere fact of a deposit in that portion of the defendant's warehouse which was in the possession and exclusive occupancy of the plaintiffs, or on the platform, or side tracks of the Railroad, would not constitute such a delivery to, and acceptance by, the defendants as to fix their responsibility as common carriers.

If there was any negligence or default on the part of the Camden and Amboy Railroad company which resulted in loss and injury to the plaintiffs, it is our duty to say to you, that the defendants are not in anywise responsible, that the engagements of the former form no part of the obligations of the latter, unless they made themselves responsible by express agreement.

If they engaged or undertook as common carriers to carry and deliver peaches beyond the terminus of their Road they were bound to do so, and would be liable for the consequences of their default.

We have been requested to charge you, that in as much as the hand-bill excepted Saturdays and Sundays, the defendants were not bound to receive and carry the plaintiffs' peaches on those days, and therefore they are not responsible for not forwarding them on a Saturday. It may be true. that they were not bound to receive and forward this portion of the plaintiffs' peaches ; but if they accepted them and undertook to carry them, there the relation of carrier and consignor existed, and the responsibility of common carriers attached to the defendants on receiving the property for transportation.

We have been requested to charge you also that the defendants were not bound by their obligations as common

carriers, to receive and forward the plaintiffs' peaches, unless they were offered for that purpose and the usual freight paid or tendered. Such, gentlemen, is the law, unless the usage of the company in respect to the payment of freight was otherwise, then a compliance with the custom whatever it might be would be necessary to charge the defendants in their capacity of common carriers. What the custom was in reference to this matter, is a question of fact for you to determine from the evidence in the cause.

We have been requested to charge you also, that if it appears from the evidence, that the loss and injury complained of by the plaintiffs was caused partly by their own negligence in buying bad fruit or shipping it in bad order, and partly by that of the defendant, the plaintiffs cannot recover. This is the law and so conceded to be by the plaintiffs' counsel, unless, however, by ordinary care the plaintiffs could not have avoided the consequences of the defendant's negligence. Whether the plaintiffs own negligence contributed to the injury and loss complained of in this case is also a question of fact to be determined by you.

I believe, gentlemen, I have now adverted to, and explained (imperfectly perhaps), all the law applicable to the case, and it now remains for you to apply the facts in evidence before you, and make up your verdict from the law as given to you by the court, and the evidence as you have it from the witnesses and otherwise.

If you should be of opinion from all the evidence, that the plaintiffs sustained loss or damage in consequence of the negligence and default of the defendants in the transportation and safe delivering of the plaintiffs' peaches, at the place of destination at the proper time and in good order, which they received from the plaintiffs, and undertook to transport from Dover to Philadelphia, your verdict should be for the plaintiffs. But if from the evidence, you should be satisfied that the defendants were not in default, but complied with all the obligations to the plaintiffs, which the law and their undertakings imposed upon them, in view of all the facts and circumstances of

the case as proved, then your verdict should be for the defendants.

If your verdict should be for the plaintiffs, the measure of damages will be the value, at the place of destination, of such of the plaintiffs' peaches, (if any) as were received from the plaintiffs by the defendants for shipment, and which by the negligence or default of the defendants were lost or destroyed, and the difference of price, which such as were delivered to and accepted by the defendants for transportation from Dover to Philadelphia, would have brought in the market delivered in due season, and in good order, and the price they actually sold for when delivered. But in the investigation of these facts, you must consider the condition of the fruit when it was accepted by the defendants, for if the peaches were not in good condition, and properly put up for shipment when delivered to them, they are not responsible for any loss which resulted from depreciation in value in consequence of the imperfect character of the fruit, or for want of its proper preparation for transportation.

Much has been said on the one side about the wealth and power of the defendants as a corporation ; and by the other side in respect to its great convenience and benefit to the public.   All this, gentlemen, may be and nevertheless is very true ;   but they are matters entirely outside of the case, and should not enter into your deliberations in deciding it.   The defendants should be held to the same degree of responsibility that individuals as common carriers would be, and they are entitled to have meted out to them the same measure of justice.

Gentlemen, you will now take the case, retire to your chamber and there give it a deliberate, attentive and impartial consideration, and render such verdict, as in your best judgment the evidence requires.

The plaintiffs had a verdict for $2,438.00.

*Ridgely*, *E. Saulsbury* and *Comegys* for the plaintiffs.

*Pratt*, *Gordon* and *D. M. Bates* for the defendants.